# United States Court of Appeals
## For the First Circuit

Nos. 06-2501, 06-2519

LUIS R. SOTO-LEBRÓN,
ELIZABETH ROSARIO DOMENECH,
CONJUGAL PARTNERSHIP SOTO-ROSARIO,

PLAINTIFFS, APPELLEES/CROSS-APPELLANTS,

v.

FEDERAL EXPRESS CORPORATION,

DEFENDANT, APPELLANT/CROSS-APPELLEE.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Salvador E. Casellas, U.S. Senior District Judge]

Before

Lipez and Howard, Circuit Judges,
and Smith,[*] District Judge.

Joseph D. Steinfield, with whom Laurie F. Rubin, Prince, Lobel, Glovsky & Tye, LLP, and Vilma Maria Dapena were on brief, for appellees.
Sandra C. Isom, with whom Carl Schuster, Mariela Rexach-Rexach, and Schuster Aguilo LLP were on brief, for appellants.

August 20, 2008

[*]Of the District of Rhode Island, sitting by designation.

**LIPEZ, <u>Circuit Judge</u>**.  Plaintiffs Luis R. Soto-Lebrón ("Soto") and his wife, Elizabeth Rosario Domenech ("Rosario"), sued Soto's former employer, Federal Express Corporation ("FedEx"), following Soto's termination by the company for a violation of company rules.[1]  The plaintiffs asserted emotional damages arising from libel, slander, and intentional infliction of emotional distress ("IIED").[2]  Soto also claimed statutory damages for wrongful termination pursuant to P.R. Laws Ann. tit. 29 §§ 185a-185m ("Act 80").  The jury returned a verdict in favor of the plaintiffs on all claims and awarded a total of $7,014,910.74 in damages.  The district court then granted FedEx's motion for judgment as a matter of law on the slander claim and ordered a remittitur on the IIED and libel awards, reducing the total award to $4,014,910.74.  FedEx appeals the sufficiency of the evidence to support the liability findings and the damage awards, except on the Act 80 claim.  Soto cross-appeals the judgment as a matter of law on his slander claim.

As we shall explain more fully below, FedEx badly mishandled the termination of Soto.  It conducted a sloppy investigation of his alleged misconduct before firing him.  There are grounds for the indignation that the jury apparently felt about

_____

[1]The complaint also named the conjugal partnership comprised of Soto and Rosario as a co-plaintiff.

[2]Because Rosario's claim is derivative, we refer to Soto, at times, as if he were the sole plaintiff.

-2-

the performance of the company. Nevertheless, any such indignation cannot overwhelm the legal rules that courts must apply to the claims of liability and the award of damages in a case such as this. Therefore, after a careful review of the record, we have concluded that Soto did not introduce sufficient evidence to establish FedEx's liability for slander and IIED, and hence we must vacate those jury verdicts. There was sufficient evidence to support liability for libel, and hence we affirm the jury's liability finding on that claim. However, we have concluded that the admission of irrelevant evidence tainted the jury's damage calculation and that taint was not cured by the remittitur. Accordingly, we remand for a new trial on damages on the libel claim.

## I.

Given the challenges to the sufficiency of the evidence, we recite the facts in the light most favorable to the jury verdict. Davignon v. Hodgson, 524 F.3d 91, 96 (1st Cir. 2008).

On May 30, 2002, Soto, a fourteen-year employee of FedEx, shipped a package through FedEx to Kissimmee, Florida. Soto's wife, Rosario, a schoolteacher, had given it to him after packaging it in her classroom with fellow teacher Loyda Romero. Rosario asked Soto to send the box, which contained hair care products, to Iris Romero, Loyda's sister, in Florida. Soto shipped it using the

FedEx employee discount policy, which permits employees and members of their immediate families to send packages at discounted rates.[3]

## A. The Security Interview

When Soto arrived at work on June 6, 2002, he was told that security wanted to speak to him. He was taken to a conference room where Jose Pérez, a FedEx security specialist, was waiting for him.[4] Pérez said: "Sit there. I am Jose Pérez from security." Throughout the interview Pérez remained seated, "leaning back on the chair." Pérez told Soto that he "had a problem." Pérez showed Soto the airwaybill for the package Soto had shipped to Florida and asked him if he recognized the bill. Soto said that he "had filled it out to send Iris Romero the package, the gift."

Pérez then told Soto that "there were problems with that package, that the package had been seized at the station where the package ended up." Soto asked what type of problem the package

_____

[3]Section 7-35 of FedEx's "People Manual" states: "FedEx Express offers FedEx Express employees . . . reduced rates for personal shipping." The "Employee Eligibility" portion of the policy states that "[t]his policy intends to offer discount shipping through the FedEx Express system to eligible employees and members of their immediate families (spouse or dependent children) as an employee benefit." Soto acknowledged receipt of this policy by signing a memorandum, dated August 30, 2001, that warned him that "[a]ny abuse of this benefit may result in termination."

[4]Soto consented to having the security interview tape recorded, but FedEx never produced the tape during discovery, reporting it lost. Accordingly, the court gave the jury a spoliation instruction, permitting the jury to draw an adverse inference from the disappearance of the tape. The facts recited herein represent Soto's description of the security interview.

-4-

had, and Pérez responded that the package "had controlled substances, drugs" and that it "had been retained" by police. Soto told him "that is impossible." Pérez responded by stating that "they had evidence, that they had laboratory reports and police records that there were drugs there." Soto testified that Pérez "had some papers on top of the conference room table and during interrogation he pull[ed] out a document from the documents he had there that he said were evidence of the drugs and he said 'I have a lab test' and throughout the interview would show the document like this . . . . [H]e waived [sic] the document to me and put it away." Pérez continued "asking [Soto] to tell the truth" and repeating that "they had evidence."

Pérez said he had been a police officer. He said that he had "left the police because he was not in agreement with the abuse of the police and to tell him the truth, that if [Soto] told him the truth, he would help [him]." Soto testified that Pérez's tone of voice and demeanor during the interview were "strong[,] . . . intimidating, with authority."

After "25 or 20 minutes" of interrogation by Pérez, Pedro Contreras, another FedEx security specialist, entered the conference room and Pérez left. Soto described Contreras as "more at ease, more peaceful than Pérez because Pérez was acting with authority." Soto explained that the substance of Contreras's questioning was the same as that of Pérez, but that Contreras's

approach was "quieter" and "calmer." Soto continued to deny that drugs had been in the package. The questioning by Contreras lasted "about 20 minutes."

Then, Pérez and Rolando Medina, the station manager, came into the room, and Pérez said, "This guy has to be suspended because he sent drugs through the system." Medina left the room and returned with a letter of suspension, which Soto signed. The suspension letter indicated that an investigation would be conducted and advised Soto to contact his manager each morning. The letter also stated, "[Y]our [sic] are not to contact any FedEx location or customers without management approval." At the end of the interview, Soto also prepared and signed a statement indicating that he had shipped the package on behalf of Loyda Romero as a favor and that he did not know the contents of the package.

Following the security interview, Soto told the FedEx officials that he had to go back to his delivery truck to retrieve his belongings. Pérez said, "You can't do that. Just stop right there." Instead, Pérez and Contreras retrieved Soto's belongings. Then another FedEx employee escorted Soto outside to the security check point where he got into his personal vehicle. As Soto was being escorted outside, he passed by an area where he would be able to see clients or customers of FedEx. He reported seeing one person in that area. Medina told Soto as he was being escorted

outside that he should "calm down, to be at ease, not do anything crazy."

Soto explained that after the interrogation he "was nervous, confused." He said: "I was shaking. I could not swallow. I was not well. I was like crazy. I was like I was crazy." When he left FedEx, he was scared. He explained, "I didn't know what I was going to do, where I was going to go and then thinking that I was going to be arrested because what I was told inside was that the package contained drugs." When he arrived home, he told his wife he had been suspended. He testified that "[s]he got hysterical. She started crying, yelling and I tried to be strong and to calm her down but I wasn't [able] to do so because we were both in the same condition."

## B.  FedEx Proceeds to Terminate Soto

Soon after Soto arrived home, he and Rosario called Iris Romero. Iris reported that she had received the package without incident. Soto and Rosario were relieved, concluding that there must have been a misunderstanding or a mistake. Soto immediately called Security Specialist Pérez to tell him that Iris had received the package. According to Soto's testimony, Pérez told him "that the package was at the Federal Express station. That there was a

test made by Becton and Dickinson[5] and that there was a police report."

Because he perceived that Pérez did not believe him, Soto then called Medina, the FedEx station manager, to explain the situation. He gave Medina the telephone number for Iris and asked him to call her, but Medina did not call. Medina repeated what Pérez had said: that a lab test had been conducted by Becton and Dickinson and that there was a police report. He told Soto that the police had the package.

Soto called in to FedEx every morning, as he had been instructed to do in his suspension letter. Each morning, he asked to speak to Medina and was instead transferred to Operations Manager Alberto Calero, Soto's immediate supervisor. Each morning, Calero responded that "they were dealing with the case." On June 11, Calero prepared and filed a report stating: "Investigation by Specialist Pérez revealed that on 5-30-02, Soto shipped [airwaybill number] for a friend of his wife, in violation of FedEx policy 7-35 [the employee reduced rate policy] as admitted by him during a taped recorded interview. Further investigation by the Orange County Sheriff Dept., Orlando, FL revealed that the package contained an undetermined amount of liquid cocaine. Soto was suspended and consequently terminated for the above violation."

---

[5]The record does not reveal what "Becton and Dickinson" is or why FedEx security personnel used this name for the lab.

On June 13, Soto was told to come into the station at three in the afternoon. Soto was brought into a conference room where Calero gave him a termination letter. Soto testified:

> Calero signs my letter of dismissal, of termination and he hadn't done any investigation so I asked him, "Calero, why did you do this? You didn't do any investigation. Why are you doing this? What did you do with the information I gave Rolando Medina? Calero, why did you do this" because he had told me that he hadn't done any investigation and if he didn't do any investigation, how can he sign the paper saying that an investigation had been done?

Calero responded that Soto "was responsible for what [his] family did." Soto asked to speak to Pérez. Medina responded that he was not available. Soto said, "[W]ell, he is not here because he [knows] that what he had accused me of was a lie because the package had been delivered and nothing had happened. There hadn't been any arrests. I had not been interrogated by any police officer."

Soto's termination letter, dated June 13, 2002, stated: "A thorough investigation of an alleged violation of the Employee reduced-rate Shipping Policy 7-35 has determined that you allowed your employee reduced rate privileges to be utilized to ship a package for an ineligible person. In addition, the shipment allowed an illegal substance to be transported through the system in further violation of FedEx policies."

-9-

Soto's termination letter informed him that he could invoke review procedures under the FedEx "Guaranteed Fair Treatment Procedure/EEO Complaint Process" ("GFTP") by submitting a request for review.  He did so in a written statement on June 17, asking the company to further investigate the allegation that the package contained drugs.

## C.  FedEx's Investigation into the Contents of the Package

At the time of the initial security interview, neither Pérez nor Contreras, the two security specialists, had a copy of a police report or a lab report identifying the contents of the package as illegal drugs.  Pérez testified that, prior to questioning Soto, he had been briefed by Contreras, who told him that "the package had been stopped by law enforcement in Orlando because allegedly it had a drug alert and they did some testing and whatever."  Later the same day, Pérez sent an email to Medina, the station manager, stating that the package contained approximately one kilogram of cocaine.  The email also stated that Pérez had made a call to investigate further and learned "that not only was there a K-9 alert, a field test conducted but, the contents were analyzed by the FDLE (Florida Dept. of Law Enforcement)."[6]  Medina forwarded this email to his supervisor, Managing Director Roby Brown, and Maruchi Torres, the acting manager of human resources.

---

[6]It appears that Pérez obtained this information from his supervisor, who had received it from FedEx security personnel in Florida.

-10-

Some time after the interview, Pérez also telephoned John Matlock, a FedEx security specialist assigned to Orlando, asking for further documentation regarding the incident. On June 13, Matlock faxed a copy of the incident report filed by the sheriff's office in Orange County, Florida to Pérez. The incident report, which was admitted at trial to show what FedEx knew – rather than for its truth – states that a K-9 alert identified the package as containing narcotics. The police officer then obtained a search warrant and opened the package. Inside, the officer found a "30 cc syring [sic] bottle" with a white substance in it. The officer stated that he did a "field persumptive [sic] test" on the substance and the "test resulted positive for the presence of cocaine."

It is now clear that the package Soto shipped did not have cocaine in it. At trial, the judge admitted a lab report indicating that the 30 cc bottle taken from Soto's package tested negative for cocaine.[7] The report, completed by the Florida Department of Law Enforcement (FDLE), is dated June 25, 2002 – twelve days after Soto's termination, but while the company's GFTP review of that decision was ongoing.

---

[7]Both Iris Romero and her daughter testified that the package had been delivered by a FedEx truck on June 4. The package was shown to the jury. Iris testified that one of the bottles, the hair relaxer, was not in its original package ("it had been taken out and place[d] in a ziplock bag"). No one from any law enforcement agency ever contacted Iris or Soto regarding the package.

When the plaintiffs sought to introduce the FDLE lab report into evidence during their case in chief, FedEx objected on the basis that there was nothing to link the report to Soto's package. The trial judge observed that FedEx had had the lab report throughout the lengthy discovery period in the case, and had filed numerous motions in limine as to other evidentiary concerns, but had never before raised the linkage issue. As a result, the trial judge allowed the plaintiffs time to request a document linking the lab report to the police officer's incident report and then allowed the plaintiffs to introduce that document, along with the lab report, as rebuttal evidence after one of FedEx's witnesses testified about the initial K-9 alert and field presumptive test.[8]

In sum, the evidence indicates that the package Soto shipped was stopped by law enforcement personnel after field testing indicated the presence of cocaine. A subsequent lab report revealed that the package contained no illicit drugs. There is no evidence to suggest that FedEx was aware of the existence of this lab report prior to the commencement of Soto's litigation. There is also no evidence to suggest that anyone at FedEx ever specifically asked for or tried to locate the FDLE lab test results at any time prior to the commencement of litigation.

---

[8]FedEx challenges this evidentiary ruling on several grounds. However, we perceive no abuse of discretion in the district court's decision.

## D.   The GFTP Review Process

On June 18, Operations Manager Calero and Station Manager Medina each wrote memoranda explaining the management rationale for Soto's termination.  Calero's memorandum stated: "After reviewing the Security Investigation outcome it was determined, that Luis R. Soto sent a package for a friend of his wife using his FedEx Employee reduced rate-shipping discount.   In addition, this violation of FedEx Policy allowed illegal substances to be shipped through the system."  Medina's memorandum stated: "Luis R. Soto admitted in a conversation with me and Security Specialist Jose Pérez, that in fact he shipped a package for a friend of his wife using his employee discount and that he was not aware of its contents.  The airwaybill utilized had Luis Soto's name as the shipper.  This violation of the Employee Reduced-Rate Shipping policy allowed an illegal substance to be transported through the FedEx system.  Some other factors considered were; that if we allow this to happen based on the premises that the contents were not of the employees [sic] knowledge we will be establishing a precedent for future situations of this magnitude.  The ultimate responsible [sic] for any shipment sent through the FedEx system is the shipper."

On June 19, Soto met with Managing Director Brown, who gave him copies of the incident report prepared by the police in Florida and the search warrant for the package.  Acting Managing

-13-

Director of Human Resources Torres, Calero, and Medina were also present at the meeting. Two days later, Brown sent Soto a letter upholding the dismissal: "A review . . . clearly demonstrates that you violated the Employee Reduced Rate Shipping Policy, (P7-35). It also should be noted that the violation of this policy allowed an illegal substance to be transported through the FedEx system, putting your fellow FedEx employees at risk."

Soto initiated the second step of the GFTP process on June 27 with a letter to Julio Colomba, a FedEx Senior Vice President. He asked, "Where is the lab report that indicates the presence of illegal substances?" On July 8, John Matlock, the Orlando security specialist, sent an email to Jesus Rodriguez, a human resources person who was working on the investigation, summarizing the evidence he had about Soto's package:

> The local Police Officer tested the contents and it tested positive. The cocaine was then removed from the pkg and then there was an attempt to deliver. There was no one home and the package was left at the door in an attempt to find the recpt. The pkg might have been delivered but it was not delivered with the cocaine in it. As far as the written results request, I sent the Security person[9] there the only written report from the police officer.

Colomba did not meet with Soto. Instead, he wrote a letter dated July 12, reaffirming the dismissal and once again stating: "A review of this issue revealed that you shipped a package through

[9]This appears to be a reference to Pérez, the security specialist who had first interviewed Soto.

-14-

the FedEx system containing an illegal drug (cocaine)." Colomba's letter was copied to each of the personnel involved in the GFTP process (Brown, Medina, Calero and Rodríguez), as well as Juan Cento (Colomba's boss), Nelly Concepcion (Rodríguez's boss), and Suzanne Gaal (Concepcion's boss). Soto testified that when he received this letter, "having a VP of the company state [that Soto] had sent drugs, cocaine," he felt as if "[his] world came to an end, [and] fell on [him]." The GFTP review was finalized with a letter on August 6, 2002. This letter did not state the reason for the termination or refer to illegal substances or any other negative information about Soto.

## E. The Plaintiffs' Emotional Distress

At trial, Soto testified that he had experienced "[e]motional damages, anxiety," sleeping problems, and "deep sadness" following the events described above. He saw a psychiatrist ten times (the maximum his health insurance would allow) beginning in October 2002, and was prescribed various medications for anxiety and panic. He explained that he had sought psychiatric treatment because he wanted to feel like himself again: "I mean that I was a happy man like every Puerto Rican. I wanted to be the heart of the party, to share with my buddies, play basketball and everything that Luis Soto entailed. I wasn't able to sleep. I would wake up every night at midnight. I didn't know what time it was but I couldn't sleep." He described himself as

"anxious always without being able to talk." When asked specifically about damage to his reputation, Soto testified: "It was said that I had sent drugs in a package and to me that was stab and as of this date, it is still in the record, my record that I transported drugs through the system, illegal substances through the system."

Rosario explained her own emotional distress as stemming from her guilt in having been the one who gave Soto the package and feeling "impotent to do something to help him." She visited a psychiatrist a couple of times and took various antidepressant medications because she was "in extreme anxiety, very nervous" and "had some panic attacks."

The district court also admitted testimony that Soto's co-workers had heard rumors that he was being accused of shipping drugs through the system, and they conveyed those rumors back to Soto. Rosario described these rumors as "devastating" for their reputation. She described her husband as having been "destroyed" by the knowledge that these rumors were circulating at FedEx.

In response to FedEx's interrogatories during discovery, Soto stated that he was seeking damages only for emotional distress. He did not claim economic damages or produce documents that would have supported a claim for lost wages. Soto failed to supplement his answers to interrogatories after economic damages were discussed at various depositions. Accordingly, the court

ruled that evidence of Soto's economic damages would be excluded under Fed. R. Civ. P. 37.  However, the court permitted testimony regarding "economic facts . . . to lay the groundwork or foundation for any emotional damages that this plaintiff may have suffered."  As a result, Soto presented other damage evidence, discussed in more detail below, describing how his family struggled financially as a result of his termination from FedEx and the emotional toll those financial struggles took.

**F.  The Verdict and Appeal**

In submitting this case to the jury following a ten-day trial, the district court used a special verdict form that required the jury to make specific findings on the particular elements of each cause of action and separate damage awards for each claim on which it found liability.  After finding liability as to all claims, the jury returned statutory damages of $14,910 for wrongful discharge, a $1,000,000 award for slander, a $3,000,000 award for libel, a $2,000,000 award for IIED, and a $1,000,000 award for Rosario on her derivative claim.  In response to a motion for remittitur and judgment as a matter of law, the district court vacated the slander award, reduced the libel award to $1,800,000, and reduced the IIED award to $1,200,000.  The district court did not reduce Rosario's $1,000,000 award, on the ground that FedEx did not argue that it should be remitted.

FedEx appeals, challenging the sufficiency of the evidence as to liability for IIED and libel, as well as the amount of the damage award, and asserting several other errors, including an evidentiary error in the admission of certain testimony regarding Soto's emotional distress damages. Soto cross-appeals, urging us to reinstate the slander award.

**II.**

We first consider the backdrop of Puerto Rico's modified at-will employment law, which plays a critical role in this case, and then turn to the issues on appeal. Puerto Rico has altered its at-will employment regime to provide for a statutory damage award when an employee without a fixed-term contract is terminated without good cause. P.R. Laws Ann. tit. 29, §§ 185a-185m. Referred to as Act 80, this statute defines good cause for termination to include, inter alia, "[t]he employee's repeated violations of the reasonable rules and regulations established for the operation of the establishment, provided a written copy thereof has been opportunely furnished to the employee." P.R. Laws Ann. tit. 29, § 185b(c). Although the statutory language requires repeated violations, the Puerto Rico Supreme Court has stated, and the jury in Soto's case was instructed, that an employer may be justified in terminating an employee after a single violation of the employer's rules if the offense is "'of such [seriousness or] nature as to reveal an attitude or a character trait so dangerous

-18-

to the peace and good order of the enterprise, that it would be imprudent to wait for a second offense to separate him from the enterprise.'"  Delgado Zayas v. Hosp. Interamericano de Medicina Avanzada, 137 D.P.R. 643, 1994 P.R.-Eng. 908,890 (P.R. 1994)[10] (quoting Secretario del Trabajo v. I.T.T. W. Hemisphere Directories, Inc., 108 D.P.R. 536, 544, 8 P.R. Offic. Trans. 564, 569-70 (P.R. 1979)).  The employer bears the burden of showing that the termination was for good cause.  29 P.R. Laws. Ann. tit. 29, § 185a.

The statute provides a formula for calculating what amounts to mandatory "severance pay" for employees who are wrongfully terminated.  Id.  The formula provides that the employee is entitled to:

> (a) The salary corresponding to two (2) months, as indemnity, if discharged within the first five (5) years of service; the salary corresponding to three (3) months if discharged after five (5) years and up to fifteen (15) years of service; the salary corresponding to six (6) months if discharged after (15) years of service.
> (b) An additional progressive compensation equal to one (1) week for each year of service, if discharged within the first five (5) years of service; to two (2) weeks for each year of service, if discharged after five (5) years and up to fifteen (15) years of service; to three (3) weeks for each year of service if discharged after fifteen (15) years of service.

[10]The official translations of many of the Puerto Rico cases cited herein do not contain internal page numbers.  Accordingly, we cannot include pin-point citation references for those cases.

Id.  For Soto, this formula produced an award of $14,910.74.

Act 80's damage formula provides the exclusive remedy for wrongful termination of at-will employees in Puerto Rico.  Porto v. Bentley P.R., Inc., 132 D.P.R. 331, 1992 P.R.-Eng. 754,807 (P.R. 1992); Arroyo v. Rattan Specialities, Inc., 117 D.P.R. 35, 65, 17 P.R. Offic. Trans. 43 (P.R. 1986); Rivera v. Sec. Nat'l Life Ins. Co., 106 D.P.R. 517, 527, 6 P.R. Offic. Trans. 727 (P.R. 1977) (referencing prior version of the statute).  A wrongfully terminated employee cannot recover emotional distress damages for the termination itself.  See Porto, 132 D.P.R. 331 ("[T]he only remedy available to an employee for a mere discharge without just cause is that provided by Act No. 80.").  However, "if other independent tortious actions concur with the discharge, the employer may be held liable for said conduct."  Porto, 132 D.P.R. 331.  Thus, the Puerto Rico Supreme Court has allowed defamation claims to proceed alongside Act 80 claims, holding that an employer's defamatory actions can be considered independent of the discharge.  Acevedo Santiago v. W. Digital Caribe, Inc., 140 D. P.R. 452, 40 P.R. Offic. Trans. ___ (P.R. 1996);[11] Porto, 132 D.P.R. 331.

_____

[11]This case is not available in English translation in Westlaw's database.  We have relied on the slip version of the official translation.

At trial, FedEx contended that it was justified in terminating Soto on the basis of his single violation of the employee shipping policy. It argued that the drug allegations were not the cause of the termination; thus, it was not obliged to fully investigate them. Soto argued that the drug allegations were clearly part of FedEx's termination decision and, as a result, they should have been fully investigated. The jury evidently agreed, finding the company liable for wrongful termination.[12] The resulting $14,910.74 award is the only compensation available to Soto for his damages arising from the fact of termination. FedEx has not appealed that award.

With this discussion as background, we turn to Soto's allegations that FedEx committed "independent tortious actions" that caused emotional harm separate from that caused by the discharge, namely his claims of slander, IIED, and libel.

**III.**

In assessing the sufficiency of the evidence, we consider whether, viewing the evidence in the light most favorable to the verdict, a rational jury could find in favor of the party who prevailed. Gillespie v. Sears, Roebuck & Co., 386 F.3d 21, 25 (1st

---

[12]The jury could have found liability for wrongful termination either by concluding that the termination was at least partially motivated by the unfounded drug allegations or by concluding that a single violation of the employee shipping policy would not be good cause for termination unless the package actually contained cocaine. Either way, FedEx's inadequate investigation of the drug allegations is implicated in the wrongful termination verdict.

-21-

Cir. 2004).  Judgment as a matter of law is warranted when "the presentation of the party's case reveals 'no legally sufficient evidentiary basis' for a reasonable jury to find for that party." Mag Jewelry Co. v. Cherokee, Inc., 496 F.3d 108, 117 (1st Cir. 2007) (quoting Fed. R. Civ. P. 50(a)(1)).  The district court's decision to grant or deny a motion for judgment as a matter of law is reviewed de novo.  Mag Jewelry Co., 496 F.3d at 117; Gillespie, 386 F.3d at 25.  In this diversity case, Puerto Rico law governs our sufficiency inquiry.  See Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); Correa v. Cruisers, a Div. of KCS Int'l, 298 F.3d 13, 22 (1st Cir. 2002).

## A.  Cross-Appeal on Slander Award

The district court determined that FedEx was entitled to judgment as a matter of law as to the slander claim because Soto had failed to link rumors regarding the cause of his termination to a FedEx employee acting within the scope of his employment.  We agree.

To establish his slander claim, Soto bore the burden of proving that a FedEx employee, acting within the scope of his employment, transmitted a false and defamatory statement to another person, and that this transmission was negligent – as opposed to merely accidental – and non-privileged.[13]  Corrada Betances v. Sea-

---

[13]Soto presented claims for both slander and libel at trial. The two causes of action differ only in that the slander claim is founded on oral statements, which allegedly accounted for the

<u>Land Serv., Inc.</u>, No. Civ. 99-1671 JP, 2000 WL 33687211, at *4-5 (D.P.R. July 25, 2000), <u>aff'd</u>, 248 F.3d 40 (1st Cir. 2001); <u>see also</u> <u>Torres Silva</u> v. <u>El Mundo, Inc.</u>, 106 D.P.R. 415, 6 P.R. Offic. Trans. 581, 598 (P.R. 1977).  Circumstantial evidence may be used to prove that it was the defendant who made a particular – allegedly defamatory – statement.  <u>See</u> <u>Riisna</u> v. <u>Am. Broad. Cos.</u>, 219 F. Supp. 2d 568, 575 (S.D.N.Y. 2002); Robert D. Sack, <u>Sack on Defamation</u> § 2.5.1, at *2-85 (Mar. 2007) ("[I]t has been said that circumstantial evidence may be used to establish that the <u>defendant</u> published the allegedly defamatory words.  That is not to say, however, that the <u>content</u> of an allegedly defamatory statement can be proven purely through hearsay.").

Soto introduced evidence that rumors regarding the reasons for his suspension and dismissal circulated widely among FedEx employees.  He testified that he did not tell anyone at FedEx what had happened.  Nonetheless, soon after he was suspended, he received inquiries from his coworkers, asking whether it was true that he had been suspended because his wife had given him a package containing drugs.

Soto also introduced testimony that FedEx kept personnel files strictly confidential.  One witness testified that, based on his fourteen years with the company, leaked information about an

---

widespread rumors of Soto's involvement with drugs, while the libel claim is founded on written statements.

-23-

employee could only come from management. However, that same witness also testified that no member of management had told him anything about the reasons for Soto's suspension.

Soto argues that the evidence that the rumors did not come from Soto himself, and that only management would have had access to the information, allowed the jury to make a reasonable inference that FedEx management personnel were the source of the rumors. However, even if it were logical to infer, as Soto argues, that someone in FedEx management must have said something to someone to start the rumors, that inference falls far short of proving each of the elements of slander. See Riisna, 219 F. Supp. 2d at 575 ("There are too many links between any statement by [the defendant], if any there were, and whatever came back to plaintiff or her informants to permit a rational inference that whatever the plaintiff or her informants heard was what [the defendant] said."). Soto's circumstantial evidence that the rumors originated with management does not establish whether management personnel spoke negligently, rather than being accidentally overheard. Soto also did not establish that the statements that sparked the rumors were false. For example, management could have stated that Soto's package was stopped by officials after a K-9 alert for drugs. That statement is true and could not be grounds for a slander claim, though it could well have sparked the rumors.

In sum, the evidence introduced in support of the slander claim "does not rise to more than informal rumors" circulating among employees, for which FedEx cannot be held liable. See Corrada Betances, 2000 WL 33687211, at *5. Accordingly, we affirm the district court's judgment as a matter of law in favor of FedEx on this claim.

## B. Intentional Infliction of Emotional Distress

Under Puerto Rico law, the elements of a claim for intentional infliction of emotional distress are: 1) that the defendant engaged in extreme and outrageous conduct; 2) that such conduct was intended to cause the plaintiff severe emotional distress, or was done with reckless disregard for the plaintiff's emotional state; 3) that the plaintiff suffered severe emotional distress; and 4) that the severe distress is causally related to the extreme and outrageous conduct. Santiago-Ramirez v. Sec'y of Dep't of Defense, 62 F.3d 445, 448 (1st Cir. 1995); Camacho v. United States, No. Civ. 04-1816 HL, 2005 WL 2644959, at *7 (D.P.R. May 24, 2005); Restatement (Second) of Torts § 46 (1965).

Because there is limited authority in Puerto Rico case law regarding IIED, we look to the Restatement and the interpretation of IIED claims in other jurisdictions for guidance. Santiago-Ramirez, 62 F.3d at 448 (relying on the Restatement and case law from other jurisdictions in an IIED case under Puerto Rico law). A comment to the Restatement explains that the plaintiff has

-25-

a heavy burden in proving that the defendant's conduct has been sufficiently offensive to permit a finding of liability:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Restatement (Second) of Torts § 46 cmt. d; see also Thorpe v. Mut. of Omaha Ins. Co., 984 F.2d 541, 545 (1st Cir. 1993) (conduct must be "extreme and outrageous," "beyond all possible bounds of decency," and "utterly intolerable in a civilized community"). Moreover, when employers have been accused of outrageous conduct toward their employees, courts have afforded employers "some latitude in investigating possible employee misconduct." Santiago-Ramirez, 62 F.3d at 448 (applying Puerto Rico law) (citing Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1558 (10th Cir. 1995)); Camacho, 2005 WL 2644959, at *7 (applying Puerto Rico law).

Soto argues that FedEx's treatment of him, "in its totality, was 'extreme and outrageous.'" He explains that his "ordeal was not an isolated event but a series of inexcusable acts

-26-

unrelated to the employment action taken against [him]."  In order to analyze whether FedEx's conduct exceeded the latitude we afford employers in "investigating possible employee misconduct" and went "beyond all possible bounds of decency," we must consider the particular actions by FedEx upon which Soto bases his IIED claim: the repeated allegations that he had shipped drugs, the security interview, and the inadequate investigation.  We address each in turn.

### 1.  Allegations That Soto Shipped Drugs

It is now clear that Soto was accused by FedEx, repeatedly and in writing, of doing something that he did not do: shipping, or allowing someone else to ship, drugs through the FedEx system.  Those were egregiously false accusations.  Those accusations are precisely the basis of his libel claim.  Such a claim cannot be brought in the guise of an IIED claim, which would divorce it from the well developed law of defamation with its attendant privileges and defenses.  See Demas v. Levitsky, 738 N.Y.S.2d 402, 409 (N.Y. App. Div. 2002) (holding that where "the conduct alleged . . . falls squarely within the scope of plaintiff's defamation claim," the plaintiff's IIED claim should have been dismissed); Grimes v. Carter, 50 Cal. Rptr. 808, 813 (Cal. Ct. App. 1966) (holding that "[i]n circumstances where a plaintiff states a case of libel or slander, [emotional distress] is a matter which may be taken into account in determining the

-27-

amount of damages to which the plaintiff is entitled, but it does not give rise to an independent cause of action on the theory of a separate tort.").

Moreover, the jury here was instructed, without objection, that "[t]he publication of a defamatory statement does not constitute extreme and outrageous conduct." This jury instruction thus became the law of the case and establishes the standard by which we review the sufficiency of the evidence on appeal. Rodriguez-Torres v. Caribbean Forms Manufacturer, Inc., 399 F.3d 52, 58 (1st Cir. 2005); see also Scott-Harris v. City of Fall River, 134 F.3d 427, 442 & n.16 (1st Cir. 1997), rev'd on other grounds, 523 U.S. 44 (1998). Soto seeks to avoid the impact of this jury instruction by asserting that it is the repetition of the defamatory statements that amounts to the "extreme and outrageous conduct" here. However, the repetition of the statements is properly analyzed in the context of an abuse of an employer's conditional privilege to speak about an employee. See Porto, 132 D.P.R. 331 (describing the elements of conditional privilege). Accordingly, to the extent that Soto's IIED claim is predicated on defamatory statements, the conduct must be considered under the framework of Soto's libel claim, which we address below,

and cannot, as a matter of law, satisfy the "extreme and outrageous conduct" requirement of the IIED claim.[14]

2.   The Security Interview

Soto also points to the security interview as "extreme and outrageous" conduct by FedEx.  As we noted above, courts have afforded employers "some latitude in investigating possible employee misconduct."  Santiago-Ramirez, 62 F.3d at 448 (citing Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1558 (10th Cir. 1995))(applying Puerto Rico law); Camacho, 2005 WL 2644959 at *7 (applying Puerto Rico law).

In Santiago-Ramirez, we addressed circumstances remarkably similar to the security interview conducted in Soto's case:

> Appellant, Santiago, worked as a cashier at Fort Buchanan's Army Post Exchange Store.  The store's policy prohibited employees from carrying merchandise through the front door.  On June 29, 1990, Santiago and a co-employee violated this policy when they removed bags containing store merchandise through the front entrance.  They placed these bags in the trunk of the co-employee's car.  Unbeknownst to Santiago, the bags contained stolen merchandise.  The Safety and Security Manager and Santiago's supervisor questioned her for a total of 45 minutes concerning this breach of store policy.  Santiago told them that she did

---

[14]Soto's brief states that "the IIED claim revolves around facts that are separate and distinct from the defamation claim and involve different injuries."  Although other portions of the brief appear to marshal the defamatory conduct in support of his IIED claim, this statement appears to be an acknowledgment that FedEx's defamatory actions cannot form the basis of Soto's IIED claim.

-29-

> not know that the merchandise was stolen but was aware of the store's regulation that prohibited employees from carrying merchandise through the front door. She was later terminated for violating this regulation.

62 F.3d at 446. During the security interview, Santiago "was shown a videotape supposedly taken at the store where she worked" and "told that if she did not cooperate with the investigation 'all of this could be taken to the F.B.I.'" Id. at 448. We held that "[b]ecause this questioning was a necessary incident of employment for an employee who had broken the rules, under Puerto Rican law it cannot be said to be intentionally tortious." Id. In analyzing Santiago's claim, we drew an analogy to Starr, a Tenth Circuit case which held that "a plaintiff's allegations that her employer yelled at her, pushed her back down into her chair, touched her arm and blocked her exit from the room during questioning, did not rise to the level of outrageousness required to state a cause of action for intentional infliction of emotional distress." Santiago-Ramirez, 62 F.3d at 448 (describing the holding in Starr, 54 F.3d at 1558).

Contrasting the facts in Starr and Santiago-Ramirez with those in Kaminski v. United Parcel Service, 501 N.Y.S.2d 871 (N.Y. App. Div. 1986), a case cited by the plaintiffs, is instructive in evaluating when an employer's interrogation of an employee suspected of violating company rules crosses over the line into "outrageous and extreme conduct." In Kaminski, UPS security personnel accused the plaintiff, a UPS driver, of "not having

reported the receipt of a cash payment for a package." 501 N.Y.S.2d at 872. The plaintiff denied the charge. The security personnel told the plaintiff that he had been identified as the thief by two eyewitnesses. "They then allegedly began to threaten him with a criminal prosecution and a prison term at Riker's Island if plaintiff did not admit stealing the money, agree to return the money, resign, and waive his rights to all health, hospital and pension benefits." Id. The plaintiff alleged that "for three hours he was subjected to these threats which were accompanied by loud, aggressive, profane and obscene language and gestures." Id. He claimed that "[a]t all times one or another of the defendants was blocking the door to the office." Id. Finally, he claimed that after three hours of this ordeal, "under duress and still denying the accusation, [he] signed resignation papers and documents relinquishing his pension plan and health and hospital benefits and statements admitting his guilt." Id. On these facts, the court permitted the employee's IIED claim to survive a motion to dismiss.

Comparing the facts in Soto's case with the facts in these three cases leads us to the conclusion that, as a matter of law, the security interview conducted by FedEx does not constitute "outrageous and extreme conduct." The interview established that Soto had used his employee discount to ship a package for his wife's friend without knowledge of its contents in violation of

-31-

FedEx's policy. The questioning lasted approximately 40-45 minutes, comparable in length to the questioning in Santiago-Ramirez. There was no evidence of any physical intimidation, blocking of the exits, or pushing. Unlike in Kaminski, Security Specialist Pérez did not threaten Soto with a prison sentence, pressure him into resigning and relinquishing his pension plan benefits, or make any other verbal threats. Under these circumstances, it is more accurate to characterize the security interview of Soto as a "necessary incident of employment for an employee who had broken the rules." See Santiago-Ramirez, 62 F.3d at 449.

The most egregious aspect of the interview was Pérez's statement that he had a lab report as he waived a piece of paper in front of Soto. Pérez was, of course, bluffing. He did not have a copy of any document other than the airwaybill at the time of the security interview. However, Pérez had been told by his supervisors that the package was intercepted by police in Florida and had tested positive for cocaine. Under these circumstances, his bluff could not reasonably be considered "beyond all possible bounds of decency."

Soto also complains that he was "summarily suspended and publicly escorted off FedEx premises." However, these actions are well within the latitude we afford employers investigating employee misconduct. The decision to remove him immediately and accompany

him as he left the company property was a reasonable course of action in the face of the allegations against him. Thus, none of the conduct during or immediately following the security interview was "extreme and outrageous."[15]  It cannot support the intentional infliction of emotional distress claim.

### 3.  The Inadequate Investigation

Soto points to the inadequacy of the investigation as another aspect of FedEx's outrageous conduct: "FedEx did little or nothing to obtain the facts, apparently preferring to avoid the truth in favor of a lie."  The inadequacy of FedEx's investigation to support the allegation that Soto's package contained drugs is unmistakable, and that inadequacy remains a troubling aspect of this case.  Soto emphasized that inadequacy as a key element of his argument that FedEx's termination of him was wrongful and, as we describe below, that FedEx had abused its conditional privilege to publish statements about an employee.  However, the inadequate investigation is not conduct on the part of FedEx that caused harm to Soto independent of the harms caused by the termination itself and the publication of the libelous statements.  The harm arising

---

[15]Soto also argues that the "mysterious" disappearance of the audio tape of the security interview should be considered as one element in FedEx's egregious course of conduct.  However, Soto was unaware that the tape had been lost until FedEx failed to produce it during discovery in this case.  As such, its disappearance is not relevant conduct for the IIED inquiry.  See Knussman v. Maryland, 272 F.3d 625, 641 (4th Cir. 2001) ("Generally speaking, litigation-induced emotional distress is never a compensable element of damages.").

from the termination is, as we explained above, compensable only under Act 80, and cannot factor into our analysis of IIED.  P.R. Laws Ann. tit. 29, § 185a; Vélez Rodríguez v. Pueblo Int'l, Inc., 135 D.P.R. 500, 1994 P.R.-Eng. 909576 (P.R. 1994) ("The compensation provided by law is the exclusive remedy for unjust discharge.").  Similarly, Soto's emotional distress arising from defamatory statements published by the company must be analyzed under the framework of libel law.

4.  The Whole Course of Conduct Theory

Soto argues that the sum total of the repeated defamation, the failure to investigate, and the security interview – FedEx's whole course of conduct – amounts to "extreme and outrageous conduct," even if the individual actions by FedEx, taken separately, would not.  We cannot agree, particularly when two of the actions cited by Soto – the repeated accusations that he shipped drugs and the inadequate investigation of that claim – cannot be considered as conduct relevant to the IIED claim.  Soto has not described any conduct, taken together or separately, that could properly form the basis of a claim for IIED.

Because Soto has failed to introduce sufficient evidence to support a finding of "extreme and outrageous conduct" by FedEx, his IIED claim necessarily fails.  Accordingly, we reverse the district court's denial of FedEx's motion for judgment as a matter

of law and vacate Soto's $1.2 million remitted damage award on that claim.

## C. Libel

FedEx also challenges the sufficiency of the evidence to support Soto's libel claim. Under Puerto Rico law, Soto must prove that FedEx negligently published false and defamatory written statements that caused him actual harm. He must also demonstrate that FedEx abused its conditional privilege to speak about its employees. Porto, 132 D.P.R. 331.

Soto asserts that FedEx published ten false and defamatory statements stating that he illegally shipped drugs:

- "The aforementioned [airwaybill] contained approximately one kg. of cocaine." Email from Security Specialist Pérez to Station Manager Medina, dated June 6, 2002.

- "[F]urther investigation . . . revealed that the package contained an undetermined amount of liquid cocaine." Incident report written by Pérez, dated June 11, 2002.[16]

- "A thorough investigation . . . has determined that you . . . allowed an illegal substance to be transported through the system in further violation of FedEx policies." Termination letter (copied to Managing Director Brown and Rodríguez, a human resources officer), dated June 13, 2002.

_____

[16]FedEx separately challenges whether this statement was ever published to any other person within FedEx. However, Operations Manager Calero's report dated June 11 explicitly refers to an investigation by Pérez. Thus, we conclude that there was sufficient evidence to allow the jury to infer that Calero read Pérez's incident report in preparing his own report.

- "This violation . . . allowed an illegal substance to be transported through the FedEx system." GFTP Memorandum prepared by Medina, dated June 18, 2002.[17]

- "[T]his violation of FedEx Policy allowed illegal substances to be shipped through the system." GFTP Memorandum prepared by Operations Manager Calero, dated June 18, 2002.

- "A review . . . clearly demonstrates that . . . the violation . . . allowed an illegal substance to be transported through the FedEx system, putting your fellow FedEx employees at risk." Letter from Brown to Soto (copied to Medina, Calero, Acting Human Resources Director Torres, and Rodriguez), dated June 21, 2002.

- "Whether or not Luis Soto was aware of the contents of the package it is clear that by allowing someone other than an immediate relative to utilize his shipping privileges he allowed an illegal substance to be placed in the FedEx system for transportation." GFTP Memorandum prepared by Brown, dated July 1, 2002.

- "In summary, Mr. Soto . . . placed himself and the Company in jeopardy by allowing illegal substances to be transported through the FedEx system." GFTP Memorandum prepared by Rodriguez, dated July 2, 2002.

- "The local Police Officer tested the contents and it tested positive. The cocaine was then removed from the pkg." Email from Matlock, the security specialist in Orlando, to Rodriguez, dated July 8, 2002.

- "A review of this issue revealed that you shipped a package through the FedEx system containing an illegal drug (cocaine)." Letter from Senior Vice President Colomba to Soto (copied to Brown, Medina, Calero, and Rodriguez, as well as their bosses, Cento, Concepcion, and Gaal), dated July 12, 2002.

---

[17]Each of the GFTP memoranda circulated among FedEx management and human resources personnel who were participating in the GFTP review process.

FedEx challenges the sufficiency of the evidence as to every element of Soto's libel claim. We address each challenge in turn.[18]

1. Falsity

FedEx insists that Soto failed to establish that the ten allegedly defamatory statements were false. FedEx does not assert that the package Soto shipped did, in fact, contain cocaine. Nonetheless, the company argues that even if the FDLE lab results show that Soto's package did not contain cocaine, those results do "not establish that Bailey, the K-9, did not alert on the package or that the presumptive field test did not return a positive result for cocaine." This argument misses the mark. The statements at issue do not assert that the package tested positive for cocaine in the field. Rather, they each conclusively assert that the package actually contained cocaine. Both the FDLE report and the fact that no law enforcement officer ever questioned Soto or Iris Romero about this illegal shipment of drugs permitted the jury to reasonably conclude that the statements were false.

---

[18]FedEx also claims that the district court erred in refusing to include a separate interrogatory as to each individual defamatory statement on the special verdict form. However, the district court did instruct the jury that it must consider each communication separately in making a determination regarding Soto's libel claim. The special verdict form here was already long and detailed. It was well within the district court's discretion to determine that the jury instruction was sufficient and that the special verdict form requested by FedEx was unnecessarily detailed. See Santos v. Posadas De P.R. Assocs., Inc., 452 F.3d 59, 65 (1st Cir. 2006).

## 2. Publication

FedEx next argues that Soto failed to establish publication because the statements were published only within FedEx and such intracorporate communications do not satisfy the publication element of the libel claim. This argument reflects an incorrect reading of Puerto Rico law. In Porto, the Puerto Rico Supreme Court expressly adopted the majority rule that intracorporate communication of a defamatory statement satisfies the publication requirement. 132 D.P.R. 331 ("[W]e hold that the reputation of a person in the workplace may be denigrated through an intracorporate communication and, if there is evidence of the same, the publication requirement is satisfied."). FedEx seizes on isolated language later in the opinion, where the court appears to conflate the concepts of publication and privilege by noting that "[t]he presence of the company personnel manager was completely logical and reasonable" in a meeting where the allegedly defamatory discharge letter was discussed. Id. However, the Puerto Rico Supreme Court's adoption of the rule that the publication requirement is satisfied by intracorporate communications was clear and unequivocal. Thus, the question of whether the internal publication was "logical and reasonable" properly belongs in the discussion of conditional privilege, to which we turn next.

-38-

3.  Abuse of Conditional Privilege

Under Puerto Rico law, communications among "managers or supervisors of a discharged employee, regarding the reasons for the discharge," are conditionally privileged.  Porto, 132 D.P.R. 331. This privilege applies to "'all bona fide communications upon any subject matter in which the author has an interest or with respect to which he has a duty to perform to others.'"  Id. (quoting Caraballo v. P.R. Ilustrado, Inc., 70 P.R.R. 265, 272 (1949)).  It is "'termed conditional because the person availing himself of it must use it in a lawful manner and for a proper purpose.'"  Id. (quoting Caraballo, 70 P.R.R. at 272).  Accordingly, the privilege is lost if the employer abuses it by giving the statement "excessive publicity" or by publishing it for "improper reasons."[19] Id.

Although there are no Puerto Rico cases directly on point, case law from other jurisdictions suggests that "improper reasons" are established and the conditional privilege destroyed where an employer is on notice that the defamatory statements are

_____

[19]FedEx asserts on appeal that plaintiffs were required to meet their burden on this issue with "clear and convincing evidence." Puerto Rico has not adopted this standard and the jury was instructed, without objection, that the preponderance of the evidence standard applies.  As such, the preponderance standard is the law of the case.  See Rodriguez-Torres, 399 F.3d at 58.  FedEx also challenges the district court's refusal to instruct the jury that "good faith is presumed."  However, the court did instruct the jury that Soto bore the burden of establishing that FedEx abused its conditional privilege.  No more was required.

-39-

of questionable validity and yet, with reckless disregard for the truth, fails to adequately investigate their veracity. See, e.g., A.B.C. Needlecraft Co. v. Dun & Bradstreet, Inc., 245 F.2d 775, 777 (2d Cir. 1957) (holding that evidence was sufficient to warrant submission of the case to the jury as to whether privilege had been abused when defendant's defamatory statement was based on a "misunderstood casual remark, with no effort to verify facts, though to have done so would have been a simple matter"); Torosyan v. Boehringer Ingelheim Pharm., Inc., 662 A.2d 89, 104 (Conn. 1995) (conditional privilege destroyed where defendants "failed to investigate or retract the statement even after the plaintiff notified them that the statement was false and requested further review"); Wirig v. Kinney Shoe Corp., 461 N.W.2d 374, 380-81 (Minn. 1990) (conditional privilege destroyed where "an employer . . . takes no steps to investigate but relies entirely on accusations either made by employees who may be biased or on second-hand hearsay with no identification of sources"); Restatement (Second) of Torts § 600 (1977) (conditional privilege fails if statement made with knowledge of falsity or reckless disregard as to its truth).

In this case, the ten defamatory statements made by FedEx were clearly within the scope of the conditional privilege as communications regarding the discharge of an employee. The jury made this finding on the special verdict form, and it has not been

challenged on appeal.  FedEx contends, however, that Soto did not meet his burden of demonstrating that FedEx had abused the privilege.  FedEx cites Cabrero Muñiz v. Zayas Seijo, 2006 WL 1313775 (P.R. 2006),[20] for the proposition that "bad investigation allows an inference [of] real malice only in exceptional circumstances and with the benefit of other evidence tending to show such malice."  That case concerned the "actual malice" requirement in the context of defamation of a public figure, not an inquiry into abuse of the conditional privilege.  However, even if we were to conclude that the same standard applies to determine "improper motive" in the privilege inquiry, the jury was entitled to infer that the circumstances here were sufficiently exceptional to allow liability to attach.

The jury heard evidence from which it could reasonably conclude that FedEx was on notice of the questionable validity of the cocaine allegations as early as June 6, when Soto called Pérez and Medina to report that Iris Romero had received the package without incident.  FedEx insisted at trial that Soto was dismissed for his violation of the employee shipping policy, not for shipping drugs.  As a result, no investigation of the drug allegations was required.  However, regardless of the reasons behind the dismissal, once FedEx was on notice that the drug allegations were

---

[20]The English translation of this case is not available on Westlaw.  We have relied on a certified slip translation.

questionable, it was obligated to either stop repeating them or adequately investigate them.  It did neither.  As a result, the jury was entitled to conclude that FedEx had "improper motives" and thereby lost the benefit of the conditional privilege because it acted with reckless disregard for the truth.[21]

4.  Sufficiency of Evidence on Actual Harm

FedEx also asserts that it is entitled to judgment as a matter of law on the libel claim because Soto failed to prove that he suffered emotional distress as a result of the publication of the libelous statements, rather than merely as a result of reading those statements himself.  We reject this assertion.  The jury could have reasonably inferred that Soto's reputation within FedEx was harmed by the connection between his name and the drug allegations.  See Porto, 132 D.P.R. 331 ("[C]orporate employees are only too human and when they learn of a defamatory statement the reputation of the affected employee is clearly demeaned in the workplace.").  Moreover, Soto did present evidence about the shame and humiliation he experienced as a direct result of knowing that the drug allegations were circulating among FedEx management.  He explained, for example, that when he received the letter from

---

[21]The jury could also have reasonably concluded that, because FedEx had not adequately investigated the drug allegations, its frequent repetition of those allegations constituted "excessive publication" of the defamatory statements, resulting in loss of the conditional privilege.  See Porto, 132 D.P.R. 331 (noting "excessive publication" destroys the conditional privilege).

-42-

Senior Vice President Colomba: "[L]ife came to an end for me because having a V.P. of the company state that I had sent drugs, cocaine . . . . My world came to an end, fell on me."  No more is required to sustain the jury's finding of liability on the libel claim.  See Gertz v. Robert Welch, Inc., 418 U.S. 323, 350 (1974) (describing "customary types of actual harm inflicted by defamatory falsehood [to] include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering"); Fiori v. Truck Drivers, Local 170, 354 F.3d 84, 87 (1st Cir. 2004) (noting that "emotional distress need be no more than 'outrage' and 'anger' upon seeing the libelous statements, since mental distress is the 'natural result' of libel" (quoting Shafir v. Steele, 727 N.E.2d 1140, 1146 (Mass. 2000))).  Accordingly, we affirm the district court's denial of FedEx's motion for judgment as a matter of law on that claim.

## IV.

In addition to its sufficiency challenges, FedEx contends that the district court improperly admitted damage testimony that was not causally linked to any issue in the case and that this evidence improperly inflated the jury's damage award.  In reviewing an allegation of evidentiary error, we must consider first whether the district court erred and then whether this error was harmful.  Ahern v. Scholz, 85 F.3d 774, 786 (1st Cir. 1996).  "A trial court's error in an evidentiary ruling only rises to the level of

harmful error if a party's substantial right is affected." Id. To determine whether a substantial right is implicated, we examine "the centrality of the evidence and the prejudicial effect of its . . . inclusion." Id. Given our disposition of the slander and IIED claims, we consider only whether the admission of the damage evidence was prejudicial error that tainted the award on the surviving libel claim.

Over FedEx's objections, the district court allowed Soto to testify extensively about emotional damages he suffered as a result of the financial difficulties his family encountered after he lost his job at FedEx. For example, he testified: "We don't have as much time as we had before to share. . . . I work more. [My wife] has had to take on providing, giving tutoring services because she is a teacher. So, she gets home from school and sometimes when I get home from work she is still dealing with Martin. Martin is my young boy and my intimate life was also affected." More specifically, Soto's counsel asked what problems he confronted "after the situation with FedEx with respect" to the child support payment he owed for another child who lived with his ex-wife, Janet. He replied:

> Well, since they would take it from my salary check, I had problems with the Family Department which is the one that has to do with child support. I talked with Janet. She is Ricardo's mother. I told her that I had been fired from Federal Express; that I had to take the steps to get another job in order to be able to pay for the child support; that I

-44-

could not send him the same amount because I didn't know what my salary was going to be. She understood it but since the payment was not reaching the Family Department, well, I was summoned. I was summoned. I asked Janet to write a letter stating that I had sent her the money and she behaved very good with me and so then I submitted it to the judge who was presiding over the case. He lowered the sum . . . .

Soto's counsel then asked how the situation with the child support made Soto feel. He responded: "It made me feel very bad because besides the fact that I would always pay and it would be deducted from my salary, I always made sure that Ricardo wasn't needing anything."

Soto also testified about his family's need to cancel a vacation in Florida as a result of his termination:

I first told my wife's relatives, family in Orlando because they were expecting us to go there on vacation. So, we had to cancel vacations because one of the benefits employees had with FedEx was that we could buy discount[ed] air fare. We had discount air fare to buy tickets and the manager has to authorize you so you can purchase the ticket and that is when the suspension came up and then termination but by then they were all expecting us. They are all over there and so then after step one [of the GFTP review] we called Lisa's family and told them about the tragedy.

Soto testified that after his termination he obtained positions at Caribbean Products and then DHL through connections with family and former co-workers. When Soto was laid-off from DHL, his supervisor there recommended him for a position at

Advance, where he worked at the time of trial.  At FedEx he made $17.45 per hour, at DHL he started at $9.75, and he was earning less than that at Advanced at the time of the trial.  A. 1116.  Soto's counsel asked how these lower earnings affected him emotionally.  He replied: "Well, right now I depend on my wife to be able to pay things for the house.  I feel impotent because of what I cannot do now.  Before I used to be the head of the household and now sometimes I have to go to my father-in-law to ask him for help and I do it now very embarrassed because I never did that before."[22]

There was never any testimony, however, establishing that Caribbean Products, DHL, or Advanced ever saw the libelous statements published by FedEx.  There was no testimony that Soto's subsequent employers' knowledge of his termination at FedEx adversely impacted his job placement or pay.  There was no testimony that he was not hired at any other company to which he applied as a result of the events at FedEx.

Soto's financial struggles and the emotional turmoil they caused have no causal connection to the libel claim.  Instead, the emotional distress Soto described is causally related only to the fact of termination and thus is evidence only of the damages

_____

[22]Similar testimony was also offered by Rosario's father, who explained that he "had to help them pay[] the studies of the little boy . . . at La Piedad School . . . [and also help pay for] some sports studies he was taking."

suffered by Soto as a result of the wrongful termination itself. These damages were not properly before the jury because, as we have explained, such damages are compensable only pursuant to Act 80, which specifies a statutorily calculated damage award based on an employee's salary and years of service. That statute does not permit the recovery of emotional distress damages for a wrongful termination.

Soto's testimony regarding the emotional suffering he endured as a result of his economic struggles would have been admissible and relevant to prove Soto's damages if he had supplied a causal link between his economic hardships and the defamatory statements made by FedEx. For example, Soto might have introduced evidence that, after his termination by FedEx, a prospective employer heard the drug allegations and, as result, refused to offer him a job. However, such a causal link was never established here.[23] Soto did not introduce any evidence suggesting that a subsequent employer or potential employer treated Soto adversely as a result of the defamatory statements made by FedEx. Indeed, Soto failed to show that those statements were ever published to anyone outside of FedEx. In the absence of such evidence, the powerful

---

[23]The district court apparently believed that evidence linking the statements and Soto's financial difficulty would be introduced and ruled that this damage testimony could come in because Soto was entitled to show the emotional harm he suffered as a result of FedEx's defamatory statements reaching future employers. However, at the end of the trial, this causal link was still missing.

testimony regarding Soto's struggle to pay his child support, his wife's need to take on more tutoring, their need to cancel their vacation to Florida, and their need to rely financially on Rosario's father was legally irrelevant to any issue properly before the jury.[24] Thus, we conclude that the district court erred in admitting this testimony.

We are also convinced that the evidentiary error was not harmless. The district court did instruct the jury that, with regard to damages for defamation, "any award you choose to make to compensate the Plaintiff may only be to redress the consequences which followed from the injury to the Plaintiff's reputation," and that "Plaintiffs cannot recover emotional damages that arise as a result of the mere fact that Soto Lébron's employment was terminated." However, the erroneously admitted evidence was the most emotionally compelling and specific damage evidence Soto presented. It would have been nearly impossible for the jury to ignore the harsh consequences to Soto and his family stemming from his wrongful termination.

---

[24]Such evidence was also irrelevant to the IIED claim, even if that were a viable claim, because there was never any suggestion that FedEx's security interview or "course of conduct" rendered Soto so emotionally incapacitated as to make him unable to look for work, find work, or perform well on the job. Thus, there is nothing to link the financial hardships the family experienced following the termination to the allegedly outrageous conduct of FedEx.

Indeed, the size of the $3 million libel award confirms that impossibility. In its remittitur decision, the district court summarized the damage evidence as follows:

> Plaintiffs presented a picture of a forty-six year old father of two who, after a successful fourteen-year tenure at Federal Express, was faced with a false accusation that he had mailed drugs and had to endure the fact that such accusation was reproduced in several written communications between his supervisors and other members of Defendant's management team. Furthermore, Plaintiffs emphasized the distress attendant to Co-plaintiff Soto's interview with Defendant's security specialist and his subsequent physical ouster of the company's premises. Plaintiff's evidence showed that Co-plaintiff Soto was distraught, humiliated, even with regards to his family, had trouble sleeping and suffered from anxiety, was generally unhappy and lost interest in his former pastimes. Plaintiffs' evidence also demonstrated that Co-plaintiff Soto was affected to such a degree that he had to seek out mental health services and take medication.

This summary does not distinguish between the emotional damages properly attributable to the libel claim and those related only to the economic damages caused by the termination. This same failure to distinguish by the jury affected a $3 million libel award that was grossly disproportionate to the gravity of the damages causally related to the libel.

Emotional damages, though difficult to quantify, are not immune from appellate review. Koster v. Trans World Airlines, Inc., 181 F.3d 24, 34-35 (1st Cir. 1999). Here, the evidence reveals that Soto was not disabled – either permanently or

-49-

temporarily – by his emotional distress. He was able to find a new job and continue working within his field. Moreover, he did not introduce any medical evidence to prove the severity of his distress. Id. at 35 ("[A]lthough emotional damages are warranted even without medical or psychiatric evidence, the lack of such evidence is relevant to the amount of award."). Thus, given the enormous size of the award here, it appears that the erroneously admitted damage evidence tainted the verdict by leading the jury to compensate Soto not only for the emotional damages stemming from the defamation but also for the emotional distress he suffered as a result of his economic woes following the termination.

The prejudicial effect of the erroneously admitted evidence could have been removed by a sufficient remittitur. However, the remitted $1.8 million award remains far beyond the damages supported by Soto's properly admitted, causally valid damage evidence. See Sanchez v. Puerto Rico Oil Co., 37 F.3d 712, 724 (1st Cir. 1994) (holding that a remitted award may be overturned if "the reduced figure remains so extravagant as to shock the appellate conscience."); Wagenmann v. Adams, 829 F.2d 196, 215 (1st Cir. 1987) (reviewing a remitted verdict to determine whether the appellant has shown that "the reduced sums remain so exorbitant, so disturbing to our collective conscience, as to entitle [it] to [a] new trial[]").

The two cases cited by the district court in support of its remittitur suggest that the remitted award should have been far lower. First, the district court cited Shaffer v. State of Ariz. Citizens Clean Election Comm'n, No. 03CV2344PHXFJM, 2006 WL 155880, at *3 (D. Ariz. Jan. 19, 2006), noting that the judge there had reduced the damages on a defamation claim by 40% "because the jury took into account damages stemming from plaintiff's termination." This characterization of Shaffer suggests that the district court in Soto's case may have been aware of the causation problems in the damage testimony. However, the Shaffer case itself illustrates why the district court's remittitur here was insufficient to cure the evidentiary error.

In Shaffer, a government employee had been wrongfully accused of felony fraud by his employer and the accusation was released to the media and appeared in the news. The district court reduced the $1.1 million damages award to $660,000. Unlike Soto, Shaffer's prospective employers had been exposed to the defamatory statements through the media. Id. at *2. However, the trial court noted that Shaffer, like Soto, had "failed to produce any evidence that prospective employers considered the defamatory statement in rejecting Shaffer's employment applications." Id. at *3. The Shaffer court also noted a causation problem within the damage award: "Moreover, it is equally plausible that Shaffer's difficulty in finding employment following his termination arose substantially

-51-

from the fact that he was dismissed from his prior position. Similarly, his emotional and reputation difficulties logically arose in part from his termination." Id. In Soto's case, where there was no evidence that any prospective employer was exposed to the defamatory statements, it is not merely "equally plausible" that his economic difficulties, and the emotional distress they caused, were unrelated to the defamatory statements. It is, in fact, the only reasonable inference. Nonetheless, Soto's remitted verdict remains nearly three times larger than the remitted verdict in Shaffer.

The second case cited by the district court, McCann v. Ruiz, 802 F. Supp. 606 (D.P.R. 1992), similarly does not support the $1.8 million remitted award. In that case, the court observed that the plaintiff had "suffered a mild form of depression and was concerned about his future and the future of his family" as a result of his employer's defamatory statements. Id. at 616. However, noting that the plaintiff's suffering "apparently did not require treatment nor . . . result in any permanent injury," the district court found the jury's award of $255,000 to be "grossly excessive" and ordered a remitted award of $100,000. Id. Soto arguably suffered a marginally more severe injury than McCann because he sought treatment from a psychiatrist. However, that distinction between the cases cannot support the enormous variance between the size of Soto's award and the award in McCann.

-52-

The remittitur in Budet-Correa v. United Parcel Service, 322 F. Supp. 2d 139 (D.P.R. 2004), provides another pertinent point of comparison. In that case, the court reduced a jury award of $825,000 in emotional distress damages to an employee of UPS who was accused of attempted murder and received a death threat from a security officer hired by the company to surveil him.[25] The plaintiff in that case introduced testimony from his treating psychologist to establish that he had an anxiety disorder. He also introduced evidence that he had been declared disabled and received Social Security disability benefits as a result of the psychological injury attributable to UPS's conduct. Despite this evidence, the court concluded that the jury award was "grossly disproportionate to the injuries established by the evidence" and reduced the award to $250,000. Id. at 142. Soto's damage evidence did not include any expert psychological testimony and did not come close to establishing that he was disabled by his emotional injury. Given these comparisons, the $1.8 million award here remains shockingly exorbitant.

The district court's task was to determine the maximum dollar amount that is supported by the evidence. Conjugal P'ship Comprised by Joseph Jones & Verneta G. Jones v. Conjugal P'ship

---

[25]The theory of liability in Budet-Correa was intentional infliction of emotional distress (based upon the death threat by the security officer), rather than libel, but the case is nevertheless instructive as to the valuation of emotional damages.

Comprised by Arthur Pineda & Toni Pineda, 22 F.3d 391, 398 (1st Cir. 1994). The Shaffer, McCann, and Budet-Correa cases do not support the district court's determination of that maximum dollar amount here. If Shaffer's $1.1 million jury award, McCann's $255,000 award, and Budet-Correa's $825,000 award were each grossly excessive, they cannot help to explain why a $1.8 million award in Soto's case is appropriate.[26]

This is not a case where we are merely second-guessing the amount of the district court's remittitur. See Sanchez, 37 F.3d at 724 (noting that when the district court has already

_____

[26]In searching for similar verdicts to guide our review of the level of emotional damages here, we follow the lead of the parties and the district court and consider cases from both Puerto Rico and other U.S. jurisdictions. These cases universally suggest that the $1.8 million dollar award is grossly excessive. See, e.g., Whitfield v. Meléndez-Rivera, 431 F.3d 1, 18 (1st Cir. 2005) (reducing award from $500,000 to $100,000 for mother of plaintiff who was shot twice in the leg by police officers; mother testified that "she was so distraught that she could not work for a month"); Peoples Bank & Trust Co. of Mountain Home v. Globe Int'l Publ'g, Inc., 978 F.2d 1065, 1071 (8th Cir. 1992) (jury verdict of $650,000 remanded for "substantial remittitur" where damage evidence was "limited to testimony describing [the plaintiff] as angry, upset, humiliated, embarrassed, depressed and disturbed"); Rady v. Forest City Enters., Inc., 501 N.E.2d 688, 690 (Ohio Com. Pl. 1986) (vacating a $1,000,000 compensatory award in a libel case where "[p]laintiff's discharge and the underlying accusations were not disclosed to persons outside the immediate group composed of her supervisors and those responsible for hiring and firing"). The cases cited by Soto in support of the $1.8 million award each involve the defamation of individuals who were prevented, by the defamation, from returning to work in their chosen fields. See, e.g., Purgess v. Sharrock, 33 F.3d 134 (2d Cir. 1994) (upholding $3.5 million award, which appears to have encompassed both emotional distress and lost future wages, for anesthesiologist based on defamatory statements accusing him of malpractice and preventing him from finding work in a private hospital).

ordered a remittitur, the appellate court's review of the remaining award is permissible, but quite constrained). Here, there is an identifiable legal error that is at the heart of the jury's inflated award.[27] We cannot discern from the court's remittitur decision whether an awareness of this legal error may have been a factor in that decision. In any case, the district court's remittitur was insufficient to correct the legal error in admitting the causally flawed damage testimony. Accordingly, we conclude that the damage award has been prejudicially tainted and must be vacated.[28]

---

[27]In some cases, an appellate court that finds a jury's verdict to be grossly disproportionate to the injuries established by the evidence may order its own remittitur, setting the proper amount of the verdict without the need for a second trial on damages. See 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 2d § 2820 ("If the appellate court concludes that the verdict is excessive, it need not necessarily reverse and order a new trial. It may give plaintiff an alternative by ordering a new trial unless plaintiff will consent to a remittitur in a specified amount."); see also, e.g., Koster, 181 F.3d at 36 (concluding that "the evidence of emotional distress would support a maximum recovery of emotional damages of $250,000" and conditioning a new trial on damages on plaintiff's rejection of that lower amount); Marchant v. Dayton Tire & Rubber Co., 836 F.2d 695, 704 (1st Cir. 1988) (setting remittitur at $300,000). In such cases, there is generally no identifiable legal error that accounts for the inflated award. In this case, where an identifiable evidentiary error directly affected the valuation of Soto's emotional distress, we conclude that our best course of action is to remand for a new trial rather than attempting to derive a maximum recovery amount from the flawed evidentiary record.

[28]Rosario's derivative award of $1 million was affected by the same evidentiary error and, additionally, includes damages for the emotional distress attributable to the now-vacated slander and IIED verdicts, and must also be vacated.

We also conclude that our decision to vacate the damage award for libel does not require us to vacate the liability finding as well.  The district court used a detailed special verdict form, and appropriate instructions, that required the jury to keep its liability determination separate from its valuation of the damages.  Thus, we conclude that the evidentiary error that skewed the damage award here did not taint the finding of liability for libel.  That finding was, as we describe above, amply supported by admissible evidence.  Moreover, we are confident that the damage issue is "'so distinct and separable from the other issues that a trial of [that] issue[] alone may be had without injustice.'"  La Plante v. Am. Honda Motor Co., 27 F.3d 731, 738 (1st Cir. 1994); Mandel v. Boston Phoenix, Inc., 456 F.3d 198, 210 (1st Cir. 2006) ("In the final analysis, then, the scope of a remand is normally a judgment call for the appellate court.").  As a result, the damages may be retried as the sole issue on remand.  The newly constituted jury will be able to evaluate Soto's damages after hearing only the evidence that is causally related to the libel claim.

**V.**

Although FedEx has prevailed on most of its appellate issues, its happiness with that outcome should be muted.  The company's termination of Soto's employment was handled badly, even though Soto himself bears some responsibility for his predicament because of his violation of the company's employee shipping policy.

-56-

Still, for reasons that remain murky, FedEx never secured the lab report, completed while the review of Soto's termination was still underway, which demonstrates that the suspicious substance in the package that Soto shipped was not liquid cocaine. This failure to secure that exculpatory drug report cost Soto his job and caused much of the misery for the Soto family that followed. Even though the jury's evaluation of this sad story cannot withstand appellate review for the reasons cited herein, FedEx should understand that judgment of the jury for what it was – a sharp rebuke for the company's handling of Soto's termination.

In summary, we affirm the district court's grant of FedEx's motion for judgment as a matter of law on the slander claim. We reverse the district court's denial of FedEx's motion for judgment as a matter of law on the IIED claim. We affirm the district court's denial of FedEx's motion for judgment as a matter of law on the libel claim, but vacate the damage awards for both Soto and Rosario on the libel claim. We remand for a new trial on damages relating to the libel claim. Each party shall bear its own costs.

**So ordered**.